John Henry MAXWELL, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19942.

United States Court of Appeals Ninth Circuit.

Nov. 7, 1966.

Dan M. Kinter, Santa Cruz, Cal., for appellant.

William P. Copple, U. S. Atty., Henry L. Zalut, Asst. U. S. Atty., for appellee.

Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

John Henry Maxwell was indicted for first degree murder committed in Indian

country, in violation of 18 U.S.C. §§ 1111 and 1152 (1964). He pleaded not guilty. At his trial the jury returned a verdict of guilty of murder in the first degree "without capital punishment." [1] A judgment of conviction and sentence to imprisonment for life was entered, from which Maxwell takes this appeal.

The essential facts pertaining to the killing may be briefly stated. About four o'clock on the afternoon of March 9, 1964, Maxwell entered a bar in Parker, Arizona, located within the boundaries of the Colorado Indian Reservation. For some hours prior to that time he had had very little to eat and had consumed a pint of intoxicating liquor. From four to seven thirty p. m., Maxwell continued to drink at the bar. He quarreled with the bar maid when she refused to serve him because he had been using foul language.

About seven p. m., Donald Short, a stranger to Maxwell, entered the bar. He verbally intervened in the quarrel between Maxwell and the bar maid. A short time later, while the two men were standing six or seven feet apart, Maxwell shot Short in the abdomen, causing Short's death.

Maxwell contends that the trial court erred in refusing to accept his plea of guilty of murder in the second degree.[2]

At the start of the trial, counsel for Maxwell indicated to the court that Maxwell wished to plead guilty to murder in the second degree, but that the United States Attorney was opposed to entry of such a plea at that time. The court took the request under advisement until the close of the Government's case-in-chief. At that time, Maxwell's counsel renewed his request.

Upon inquiry, the court then learned that Maxwell understood that the penalty for murder in the second degree is a term of years up to life imprisonment. The court next ascertained from Maxwell that he had discussed the matter with his attorneys and that it was his own decision to plead guilty. Maxwell assured the court, upon inquiry, that no promises had been made in order to induce him to plead guilty, and that he understood that it was the judge's duty to determine the sentence if a guilty plea were accepted.

In connection with these inquiries by the court, the following colloquy then occurred:

"THE COURT: Now, are you pleading guilty in this matter and pleading guilty to a charge of second degree murder because you are guilty of that charge and for no other reason? THE DEFENDANT: No, sir. I don't know. THE COURT: You don't know? THE DEFENDANT: No, sir. THE COURT: Why don't you know? THE DEFENDANT: Because I did too much drinking at this time. THE COURT: You have no recollection? THE DEFENDANT: No, sir. THE COURT: The testimony of this morning has not refreshed your recollection as to the events of that time? THE DEFENDANT: No, sir. THE COURT: None at all? THE DEFENDANT: No.

"THE COURT: Under the circumstances, you realize, Mr. Maxwell, that you have the opportunity to prevent and present evidence in your own behalf before this jury? You understand that? You can proceed with this trial and present whatever evidence you have? THE DEFENDANT: Yes, sir. THE COURT: You understand that? THE DEFENDANT: Yes, sir.

"THE COURT: I regret, gentlemen, that I can't accept the plea of guilty, when this man doesn't know whether he committed the crime or not, according to his own statement. So we will proceed."

---

1. This procedure is authorized by 18 U. S.C. § 1111(b).

2. The authorized sentence for second degree murder is imprisonment for any term of years or for life. See 18 U.S.C. § 1111(b).

It therefore appears that the trial court rejected the plea of guilty to second degree murder, not because of any doubt that the plea was made voluntarily and with understanding of the consequences, but because Maxwell, being unable to recollect what had occurred in the bar, did not personally know whether he had committed the crime. Maxwell argues that the trial court was without authority to reject the plea for this reason, and was obliged to accept it.

The entry of pleas is governed by Rule 11, Federal Rules of Criminal Procedure, 18 U.S.C.A., Rule 11, which reads as follows:

> "A defendant may plead not guilty, guilty or, with the consent of the court, *nolo contendere*. The court may refuse to accept a plea of guilty, and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge. If a defendant refuses to plead or if the court refuses to accept a plea of guilty or if a defendant corporation fails to appear, the court shall enter a plea of not guilty."

The second sentence of Rule 11 begins with the words "The court *may* refuse to accept a plea of guilty * * *" (emphasis supplied), these words implying that the court has discretion in the matter. But Maxwell urges that this implication of discretion is overcome by the immediately succeeding words " * * * and *shall* not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge." (Emphasis supplied.)

■ We do not agree. Under Rule 11, the acceptance or rejection of a plea of guilty lies within the sound discretion of the trial court but, in no event, shall the court exercise discretion in favor of accepting the plea unless it first determines that the plea is made voluntarily with understanding of the nature of the charge. See Lynch v. Overholser, 369 U.S. 705, 719, 82 S.Ct. 1063, 8 L.Ed.2d 211; Tomlinson et al. v. United States,

68 App.D.C. 106, 93 F.2d 652, 654, 114 A.L.R. 1315. The precise contention made by Maxwell, pertaining to the construction of the "may" and "shall" clauses of Rule 11, was rejected in Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388, 391, reversed on other grounds in Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211. In that case the District of Columbia Court of Appeals stated that the "permissive clause beginning with 'may' indicates a general discretion in the court, while the mandatory clause beginning with 'shall not' indicates one circumstance where the court has no discretion but must refuse to permit the guilty plea." 288 F.2d at 392.

Maxwell calls attention to the opinion of this court in City of Burbank v. General Electric Company, 9 Cir., 329 F.2d 825. In discussing the difference between a guilty plea and a plea of *nolo contendere,* entered in a Government antitrust prosecution, we said (at page 835), that one of the differences coming to mind is that " * * * a plea of guilty may be made by a defendant (if he knows what he is doing), as a right. A plea of *nolo contendere* may not." However, we indicated in a footnote on that page of the opinion that we were there speaking of the usual corporate antitrust defendant, and that as to "un-understanding" individuals charged with ordinary federal crimes, " * * * the court may refuse a plea of guilty. * * *"

The other cases cited by Maxwell on this branch of the case are not in point. In McCall v. United States, 4 Cir., 256 F.2d 936, it was held only that it is the duty of the judge to make certain that a defendant who offers a plea of guilty understands its nature. It was not held that, if the court makes certain of this, the plea of guilty must be accepted. United States v. Mack, 7 Cir., 249 F.2d 421, and United States v. Lester, 2 Cir., 247 F.2d 496, fall in the same category. Mason v. United States, 10 Cir., 250 F.2d 704, stands for the proposition that the trial court is vested with a broad discretion in determining whether a plea of *nolo contendere* shall be accepted.

The court did not discuss the discretion of the court with respect to guilty pleas.

██ In our opinion the district court did not abuse its discretion in refusing to accept the plea of guilty.[3] This is especially true since Maxwell did not offer to plead guilty to the crime charged —first degree murder—but to the lesser charge of second degree murder. Even if the Government had consented to accept a plea of guilty to a lesser charge, the court would still not have been obliged to accept it.[4]

Maxwell next contends that the trial court erred in admitting in evidence, over his objection, a photograph of the body of the deceased. The photograph was introduced in evidence during the testimony of Dr. Thomas B. Jarvis, who testified for the Government concerning an autopsy he had performed on the body of the deceased. Dr. Jarvis testified that the body shown in the photograph was the one on which he had performed the autopsy, and that, having known that person during his lifetime he knew the body was that of Donald Short.

Maxwell's attorney objected to reception of the photograph on the ground that it was not needed for purposes of identification and that any relevance that it may have was outweighed by the bias and prejudice it would engender against Maxwell. The Government took the position that the photograph was relevant

in proving that Short's life had been taken. The trial court overruled the objection, holding that the picture was not sufficiently inflammatory to be prejudicial. Before the photograph was shown to the jury, and to minimize any prejudice which might be caused by the photograph, the trial court excised the lower part of the photograph which showed the wound in the abdomen.

██ The admission or rejection of photographs lies largely in the sound discretion of the trial court, and in the absence of a showing of abuse of discretion, the trial court's ruling will not be disturbed on appeal. See Rivers v. United States, 9 Cir., 270 F.2d 435, 438, quoting to this effect, State v. Griffith, 52 Wash. 2d 721, 727, 328 P.2d 897, 900. In *Rivers* we also approved as a valid statement of the considerations which should guide a trial court in exercising this discretion, the following language in People v. Chavez, 50 Cal.2d 778, 792, 329 P.2d 907, 916:

"Such photographs should be excluded where their principal effect would be to inflame the jurors against the defendant because of the horror of the crime; on the other hand, if they have a probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, they are admissible, and the resolution of this

**3.** We do not hold, however, that because Maxwell was unable to recollect the transaction and so could not personally vouch for his guilt, the trial court was obliged to reject his plea of guilty to second degree murder. The offer to plead guilty came at the close of the Government's case, when a factual basis for a plea of guilty to at least second degree murder had been established, or so the trial court might have found. Under these circumstances, the court, if it saw fit, could have accepted Maxwell's plea.

In this connection it may be noted that Rule 11, Federal Rules of Criminal Procedure has recently been amended to add, among other things, a sentence at the end reading: "The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis

for the plea." This rule amendment was not in effect when Maxwell was before the trial court.

**4.** At the time Maxwell renewed his request to plead guilty, the Government attorney made the following statement, which could be construed either as Government consent to a plea of guilty to second degree murder, or merely as evidencing the Government's desire to assist the court if the court decided to accept the plea:

"Your Honor, I am sorry to interrupt the Court now. Is this just inquiries of the Court? Because if the Court is satisfied that the plea should be accepted, I would draw up a new information for a waiver and file a second degree information for Mr. Maxwell to plead to, if the Court is satisfied that it does wish to take his plea."

question is primarily for the trial court in the exercise of its discretion."

■■■ The photograph in question was relevant and material evidence tending to prove the crime charged. The Government might have been able to prove the charge without producing the photograph. It was not required to take that chance, however, unless the picture was of such a gruesome and horrifying nature that its probative value was outweighed by the danger of inflaming the jury against Maxwell. We have examined the photograph and find it to be relatively innocuous. The trial court did not abuse its discretion in receiving the photograph in evidence and in permitting the jury to see a part of it.

Maxwell's final argument on appeal relates to the refusal of the trial court to give two of his requested instructions relating to his insanity defense.

During the presentation of Maxwell's case, Dr. Richard E. H. Duisberg, a specialist in psychiatry, testified that he had examined Maxwell for about an hour on October 27, 1964, which was seven and a half months after the shooting. Based upon that examination, which included an exploration of Maxwell's past history, Dr. Duisberg expressed the opinion that Maxwell was basically a rather shy submissive-passive individual, and was not the kind of individual who would commit a violent crime unless provoked. The doctor also expressed the view that consumption of alcohol would tend to reduce the amount of provocation necessary to make a person act in a violent manner.

Dr. Duisberg stated that Maxwell's past history indicated that Maxwell had been jailed six or eight times during the preceding twelve years, usually for drunken and disorderly conduct. Max-

well was also involved in a number of automobile accidents, and while in the service had several AWOL's, resulting in summary court-martials. On one occasion, Maxwell told Dr. Duisberg, while he was working as an attendant at a Veterans Administration hospital in California, he "got pretty drunk" and wound up in Tucson, Arizona, not knowing quite how he got there. The doctor attributed this gap in memory to "a kind of alcoholic fog or fugue." [5]

Posing a hypothetical set of facts, counsel for Maxwell then asked Dr. Duisberg to express an opinion as to whether or not Maxwell "knew the nature and consequences of his acts and could tell the difference between right and wrong at the time that he pulled the trigger. * * *" The doctor gave this answer:

"Many people do feel that an alcoholic has an unlimited capacity for booze, and this is not so. As the alcoholic becomes more deteriorated, his susceptibility to alcohol increases, until it takes very little to produce a disturbance of behavior. And so, on that basis, plus the other features which you mentioned, I think it is quite feasible to consider that he did not clearly understand the full nature and consequences of his behavior or actions at that moment."

There was no other evidence favorable to Maxwell insofar as his insanity defense was concerned.

In rebuttal, the Government called Dr. Harrison E. Baker, a specialist in psychiatry, who had examined Maxwell as a result of a court order. On the basis of two examinations of Maxwell, one on August 12, 1964, and the other on October 29, 1964, each lasting about an hour, the doctor stated that he did not find any indication of psychosis on either occa-

---

5. Dr. Duisberg testified that:
 "A fugue in medical terminology is a state of confused awareness, confused consciousness, like a nightmare, a dream, a momentary awayness. Some-

times it occurs with epilepsy. It can occur with hysterics. It is a kind of loss of self-control and of clear consciousness of oneself."

sion.[6] Dr. Baker also expressed the opinion that, although Maxwell's ability to distinguish right from wrong may have been somewhat impaired by virtue of his intoxication, he was still capable of distinguishing between the two.

The trial court gave an instruction defining insanity, quoted in the margin, to which no objection was taken.[7] Maxwell does not here contend that this instruction was erroneous, although he asserts that it is "subtle and difficult to easily comprehend. * * *" He argues that the instruction given, coupled with his requested instruction No. 7, " * * * would have been the extra security needed to insure that the jury

understood the test of irresistible impulse." [8]

The instruction given by the trial court, quoted in note 7, contains three tests of insanity, any one of which, if met under the facts of this case, would require acquittal. For purposes of discussion, these tests will be referred to as: (1) the "right-wrong" test; (2) the "nature of the act" test; and (3) the "uncontrollable act" test.[9] This instruction follows, in substance,[10] the three-test instruction allowed by the Supreme Court in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750,[11] and approved by this court in An-

6. A psychosis, Dr. Baker stated, is a severe form of mental illness, primarily characterized by inability of an individual to distinguish the real from the imagined and to reason and think in a clear fashion, based on reality.

7. " 'Insane,' as here used, means such a perverted and deranged condition of a person's mental and moral faculties as to render him either incapable of distinguishing between right and wrong, or incapable of knowing the nature of the act he is committing; or where he is conscious of the nature of the act he is committing and able to distinguish between right and wrong, and knows the act is wrong, yet his will, by which I mean the governing power of his mind, has been so completely destroyed that his actions are not subject to it, but are beyond his control."

8. Maxwell's requested instruction No. 7 reads as follows:

"You are instructed that if the defendant was suffering from a disease or defect of his mental faculties, which so far destroyed his will, the governing power of the mind, that his actions were not subject to the will, but beyond its control, then in legal contemplation, he was insane and not responsible, though he may have understood the nature of those acts, and have been conscious of their wrong.

If, as I have said, there was such lack of willpower and control it must have been the result of a disease or disorder or defect of the mental faculties. Fisher v. United States, 328 U.S. 463 [66 S.Ct. 1318, 90 L.Ed. 1382.]"

9. Courts frequently refer to any test pertaining to uncontrollable acts as an "irre-

sistible impulse" test. However, as we pointed out in Sauer v. United States, 9 Cir., 241 F.2d 640, 650, "irresistible impulse" is perhaps an inept phrase. It appears to relate only to spontaneous, sudden feeling, whereas such urges may be the result of long periods of brooding and reflection. For this reason we here use the term "uncontrollable act" in substitution for "irresistible impulse."

10. The trial court instruction does deviate in one respect from the three-test instruction allowed by the Supreme Court in Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750. Whereas both Davis and Andersen v. United States, 9 Cir., 237 F.2d 118, made it clear that an uncontrollable act must be one in which the governing power of the mind has been "otherwise than voluntarily" so completely destroyed that the defendant's acts are not subject to it, but are beyond his control, the instruction given by the trial court in our case does not contain the words "otherwise than voluntarily." Since the elimination of these words could not have prejudiced Maxwell, and since Maxwell does not object to this instruction, we need not decide whether a correct statement of the law requires the inclusion of the quoted words.

11. In *Davis*, although these tests were not explicitly approved as embodying a correct statement of the law, the court did state that submitting these instructions to the jury was, under the circumstances of that case, "in no degree prejudicial to the rights of the defendant * * *." (*Davis*, at 378, 217 S.Ct. at 362). However, in Hotema v. United States, 186 U.S. 413, 420, 22 S.Ct. 895, 46 L.Ed. 1225, the Supreme Court approved the

dersen v. United States, 9 Cir., 237 F.2d 118, 127–128.[12]

Maxwell's requested instruction No. 7 is a variation of the uncontrollable act test. If, as requested by Maxwell, it had been coupled with the instruction given by the trial court, it would have resulted in partially overlapping versions of this feature of the insanity instruction. Additionally, no evidence was received tending to show that Maxwell had given way to an uncontrollable act. Dr. Duisberg's statement quoted above, given in answer to a hypothetical question, falls considerably short of a clear-cut expression of opinion that Maxwell was insane in the legal sense at the time the act was committed. But in any event, if his statement is regarded as the expression of an opinion of this character it dealt only with the "nature of the act" test.[13]

No additional instruction was therefore required as to uncontrollable acts,[14] and by the same token, any inadequacy as to the instruction given on that subject, or the failure to give requested instruction No. 7, could not have prejudiced Maxwell. The trial court did not err in rejecting that proposed instruction.

The court also refused to give Maxwell's requested instruction No. 8, which is too lengthy to set out verbatim in this opinion. Apart from the inclusion of a "reasonable doubt" factor, which is not here in question, proposed instruction No. 8 conforms closely to the formula approved in United States v. Currens, 3 Cir., 290 F.2d 751, 774, except that it is phrased negatively rather than affirmatively, and is unnecessarily verbose, stating the test at least three times.[15]

first two of these tests, which are the two alternative tests of M'Naghten's Rules, 10 Cl. and F. 200, 210; 8 Eng. Rep. 718, 722, and held (at page 418, 22 S.Ct. 895), that a variation of the third test as there given was not prejudicial under the circumstances of that case. And in Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631, the Supreme Court stated that the instruction there given was in accord with the "principle" declared in *Davis*.

12. In Sauer v. United States, 9 Cir., 241 F.2d 640, this court upheld the instruction on insanity there given. The instruction thus approved is not set out in the opinion. The court stated, however, that it was expressed "in terms of the traditional right and wrong test as supplemented by the so-called irresistible impulse rule," and was substantially identical with that given in the *Andersen* case. *Sauer*, at 642. While the instruction in *Andersen* did not use the words "irresistible impulse," (237 F.2d at 127), but employed the broader language used by the trial court in our case, the trial court in *Sauer* actually used the "irresistible impulse" phraseology. As to this term, however, our court said in *Sauer* (241 F.2d at page 650): "The fact that the trial court here used that term cannot constitute prejudicial error, in light of previous cases approving it, and the entire instruction on criminal responsibility."

13. While, in Fisher v. United States, 328 U.S. 463, 467–470, 66 S.Ct. 1318, 90

L.Ed. 1382, the Court upheld an instruction containing an expanded definition of "irresistible impulse," there was no problem, such as we have here, of a tendered instruction which overlaps another instruction to which no objection was taken, and there was evidence in *Fisher*, lacking here, which would have supported a finding that the killing might have resulted from an uncontrollable act.

14. See McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847, 851–852. See also, Hotema v. United States, 186 U.S. 413, 417–418, 22 S.Ct. 895, 46 L. Ed. 1225.

15. The *Currens* formula reads as follows: "The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." (Footnote omitted.) 290 F.2d at 774.

As the *Currens* court noted (at page 774), this formula is substantially the same as that set forth in section 4.01 of the American Law Institute Model Penal Code, adopted in 1962, except that it omits, after the words "lacked substantial capacity," the words "to appreciate the *criminality* of his conduct or * * *." (Emphasis supplied.) As noted in United States v. Freeman, 2 Cir., 357 F.2d 606, 622, note 52, the American Law Institute suggested "wrongfulness" as an alternative to "crim-

It may be that, sooner or later, this court will again wish to review this general problem, last examined at length in the *Sauer* case, decided in 1957.[16] However, we do not believe this should be done in a case such as this, where the evidence as to any insanity was extremely meager, and where no perceivable prejudice resulted from failure to give an instruction more in keeping with the A.L.I. formulation.

 The evidence tending to show insanity in the present case is limited to a half-hearted opinion that Maxwell did not clearly understand the full nature and consequences of his behavior or actions at the moment the act was committed. Had the jury accepted that opinion, which was opposed to the opinion given by the court-appointed psychiatric expert, it would have acquitted Maxwell under the instruction given,[17] whether or not requested instruction No. 8 or any other instruction akin to the A.L.I. formulation had been given. Maxwell was therefore not prejudiced by the failure to give such an instruction.

We express no opinion as to the correctness of requested instruction No. 8, or as to the A.L.I. proposal or variations of that proposal, nor do we now indicate either approval or disapproval of the *Davis* instruction, followed in *Andersen* and *Sauer*. The trial court did not err in rejecting requested instruction No. 8.

Affirmed.

---

inality," and the *Freeman* court thought "wrongfulness" was to be preferred. The *Freeman* court adopted the A.L.I. formulation with no other change.

16. In Durham v. United States, 94 U.S. App.D.C. 228, 214 F.2d 862, 45 A.L.R. 2d 1430, *decided prior to our decision in Sauer,* the District of Columbia Circuit approved an insanity test which departs from the test approved in Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750. The District of Columbia Circuit modified the *Durham* test in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, decided in 1962.

Since *Sauer*, the Third, Tenth, and Second Circuits, in order, have also departed from the *Davis* instruction, the Third and Tenth Circuits approving variations of the A.L.I. proposal. The Second Circuit, as noted above, accepted the A.L.I. proposal without change except for utilization of the A.L.I.'s proposed alternative word "wrongfulness" for "criminality." See United States v. Currens, 3 Cir., 290 F.2d 751 (1961); Wion v. United States, 10 Cir., 325 F.2d 420 (1963); and United States v. Freeman. 2nd Cir., 357 F.2d 606 (1966).

17. See note 7, supra.